UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **WELLS FARGO CAPITAL FINANCE, INC.,** | Civil Case No. 3:10-65-KI |
| Plaintiff, | OPINION AND ORDER ON BANGOR HYDRO'S MOTION TO ESTABLISH PRIORITY AND DISTRIBUTE PROCEEDS |
| v. | |
| **NORTH PACIFIC GROUP, INC., NOR PAC ENTERPRISES, INC., RTH LUMBER CO., and BURNS HOLDINGS, INC.** | |
| Defendants. | |

KING, Judge:

Plaintiff Wells Fargo Capital Finance, Inc. brought a Complaint against defendants North

Pacific Group, Inc., NOR PAC Enterprises, Inc., RTH Lumber Co., and Burns Holdings Co.

Page 1 - OPINION AND ORDER ON BANGOR HYDRO'S MOTION

(collectively, "NPG") seeking the appointment of a receiver in order to collect $42 million in

loans on which NPG had defaulted. The Court appointed Receiver Edward Hostmann, Inc. who

proceeded to liquidate defendants' property to satisfy the loan obligation as well as debts owed to

other creditors. Pending before the Court is a motion filed by a creditor Bangor Hydro Electric

Company entitled Motion to Establish Priority and Distribute Proceeds of the Bangor Hydro

Blocked Account [555]. For the following reasons, I deny the motion.

**BACKGROUND**

Both the Receiver and Bangor agree there are no material facts in dispute.

One of the very first actions undertaken by the Receiver was a sale of some of NPG's

assets to Atlas Trading Acquisition LLC. Bangor filed a claim for $663,131, asserting a special

property interest in timber mats pursuant to UCC Article 2-502. The Receiver set aside sufficient

monies to satisfy Bangor's claim should it prove to be valid. Bangor seeks to have me establish

priority and distribute these funds, asserting it has a security interest in the proceeds of the sale of

NPG assets. Atlas subsequently assigned the NPG assets to Bridgewell Resources, LLC, as a

result, I refer to the buyer as Bridgwell throughout this opinion.

Bangor's claim arises out of an order it placed for 3,000 timber mats from NPG on

October 8, 2009. Bangor "uses timber mats approximately eight inches thick and four feet by

sixteen feet wide upon which to store and transport equipment[.]" Martin Decl. ¶ 3. Pursuant to

the purchase order, NPG was to manufacture the timber mats prior to December 31, 2009, mark

them with Bangor's name, and hold them until sometime in 2010. The timber mats were to be

8"x4'x16'. NPG sent an unsigned invoice to Bangor on December 18, 2009. An internal email

indicated NPG planned to fill a gap in the order with 18' mats. After reviewing photos of mats

Page 2 - OPINION AND ORDER ON BANGOR HYDRO'S MOTION

stamped with Bangor's name demonstrating that all the mats had been purportedly been manufactured and were ready for delivery, Bangor wired $1,164,750.00 to NPG on January 15, 2010 in complete fulfillment of its contract obligation.  Five days later, NPG was placed into receivership.

Bangor learned of the receivership on February 1, 2010,[1] and on February 2, Joe Passadore, an NPG employee who continued to work for Bridgewell after the sale, informed Bangor that the Receiver had accepted a proposal from Bridgewell to buy NPG.  Passadore further informed Bangor that Bridgewell intended to sign the Asset Purchase Agreement on Friday, "which is the final step in the transition process."  Miller Decl. Ex. 4, at 14.  On February 3, Passadore assured Bangor that the 3,000 mats had been produced and were in specific locations around the country.  He reported that the "trigger" for delivery would be a signed APA and establishment of the new company, making the time frame "some time in mid March." Martin Decl. Ex. D, at 1.  He also assured Bangor that the Receiver "does not work for us" but for the bank and that the people Bangor was talking to were "the people that are right in the mix of this process[.]"  Id.  In response to Bangor's request that the Receiver join a conference call, Passadore said receivers do not normally do such a thing and that this one was no exception.  On February 5, Passadore reported that he would have to cut back a "few" of the mats that were 18' and 20' rather than the 16' ordered, but he was setting up trucks to deliver 295 mats in the middle of the following week.  Martin Decl. Ex. D, at 2.  Later the same he day, he repeated he would begin shipping early the following week.

---

[1]This date is based on Martin's declaration, but other evidence suggests Bangor learned of the receivership as early as January 25, 2010.  Landress Supplemental Decl. Ex 8, at 3.  The difference in dates is not material.

Bangor discussed the debacle internally.  In-house counsel advised Bangor that allowing

NPG a few days to begin shipping involved risk.  If NPG's assets were sold before Bangor could

recover the mats or the purchase price, the new buyer could cancel the agreement leaving Bangor

"with a claim against [NPG] who will not have assets to satisfy the claim."  Landress

Supplemental Decl. Ex. 7, at 2.  He also put Bangor in the category of unsecured creditors,

suggesting Bangor could "work[] with other unsecured creditors to put [NPG] in bankrupcty."

Id.

The following Monday, on February 8, 2010, Bangor notified the Receiver that it had

paid for 3,000 timber mats and had an interest in them, and demanded delivery of them.  The

notice included the following statement:

> I wanted to make you aware that under the Uniform Commercial Code, Section 2-
> 502 (Oregon Laws 75.5020) Bangor Hydro holds a special property interest in
> these mats, which is superior in all respects to claims by any other creditor.  In
> addition to securing the delivery of the mats, the purpose of this letter is to notify
> you that no action should be taken by any party which interferes with [Bangor's]
> special property interest or otherwise disposes of this material.  In the event
> delivery of the identified mats is not immediately forthcoming, [Bangor] intends
> to exercise its rights under the UCC, including the right to replevy the goods.

Martin Decl. Ex. E.  That day, Passadore emailed Bangor and informed it that the contact with

the Receiver "has caused a huge delay and issues," that the Receiver froze his ability to ship the

mats, and that Passadore had to get the Receiver comfortable.  Miller Decl. in Supp. of Bangor's

Supplemental Mem. Ex. 1.

The Receiver investigated the circumstances of the timber mat order and learned that

NPG had fewer than 600 timber mats with the dimensions called for by the contract.  In fact, the

Receiver learned that the mats identified by Passadore actually consisted of mats of varying age,

Page 4 - OPINION AND ORDER ON BANGOR HYDRO'S MOTION

quality, condition and length. To complete the order, the Receiver would have to expend receivership funds and he concluded he did not have the authority to spend those funds to complete and ship thousands of timber mats. He informed NPG that it was not authorized to expend receivership funds to complete the timber mat order. A February 9 memorandum reports Bangor called the mills and learned the mats were not in the 16' size they wanted, and that Bangor told NPG it did not want the 18' and 20' mats. Additionally, Passadore summarized his contacts with Bangor, indicating Bangor "expressed [it] will not take another mat except 16' mats and [it] want[s] me to make I sure I understand that." Landress Supplemental Decl. Ex. 8, at 3.

On February 10, Passadore told Bangor he was "getting special relief" or "trying to" from the Receiver to ship, and that "I also have had to make sure all your material is 16' only and that has caused me heartburn." Miller Decl. in Supp. of Bangor's Supplemental Mem. Ex. 4.

Bridgewell signed the Asset Purchase Agreement on February 10.

On February 11, Passadore informed Bangor that 1,792 of the mats would be shipped by March 19 and the remaining mats would be shipped by around the second week of April. The Receiver knew nothing of these arrangements. As of February 18, Bangor started receiving mats.

The Court approved the NPG sale to Bridgewell on February 25. The Court's order provided that Bridgewell received the purchased assets free and clear and that all obligations, claims, and the like arising prior to the closing date attached to the net proceeds of the sale in order of priority. On February 26, Passadore informed Bangor that it would receive 848 mats by March 9 and that "[s]hipping will resume once the era of Bridgewell begins." Martin Decl. Ex. G. On March 1, 2010, the sale was finalized.

Page 5 - OPINION AND ORDER ON BANGOR HYDRO'S MOTION

No one from the Receiver contacted Bangor to say that the NPG staff were not authorized to ship the timber mats.

On March 5, Passadore forwarded an email to Bangor reporting it had delivered a total of 447 mats so far, 444 of them were conforming and 3 were 18' long.  Passadore told Bangor it would not be charged for the 18' mats.  He also promised the remaining mats would be delivered "basically on schedule."  Miller Decl. Ex. 1, at 6.

NPG and Bridgewell together delivered 1,292 mats, which were all of the mats in NPG's inventory before the sale to Bridgewell, plus some mats provided by Bridgewell.  These mats all met the requisite dimensions.  There are 1,708 mats ($663,131.00) owing.  In April 2010, Bridgewell stopped delivering the mats to Bangor, for reasons unknown to the Receiver. Bridgewell informed Bangor that the mats Bangor purchased from NPG "are no longer around" and that Bridgewell had been helping as a courtesy but that the remaining mats were gone. Miller Decl. Ex. 1, at 9.  It further reported it was not in a position to pursue those "who took [the mats] or otherwise sold them."  Id.

On June 15, 2010, Bangor filed a proof of claim for $664,000 identifying the timber mats as the security for the claim and describing its interest as a "special property interest" pursuant to UCC-2-502.  Landress Supplemental Decl. Ex. 1, at 2.

## DISCUSSION

Bangor identifies two alternative grounds for its right to the funds in the blocked account: it contends it has either an Article 9 security interest or an Article 2 special property interest.

I.      Whether Bangor has an Article 9 Security Interest

Bangor asks that I consider the totality of the circumstances and find it has a perfected UCC Article 9 security interest in the net proceeds from the NPG sale to Bridgewell.  Bangor claims it and NPG agreed that NPG would hold the timber mats on behalf of Bangor, mark the mats with Bangor's name and then deliver the mats upon Bangor's request.  See ORS 79.01012(ttt) (defining security agreement as an "agreement that creates or provides for a security interest"); ORS 71.2010(ii) (defining "security interest" and explaining that a buyer of goods may acquire a "security interest" by complying with ORS chapter 79).[2]   In addition, in an NPG email, Passadore reminded another NPG employee that "once we stencil the material we can not touch it.  No robbing Peter to pay Paul . . . No exceptions."  Second Miller Decl. Ex. 1, at 14.  Bangor asserts that no special words are required in the agreement just so long as it is clear the parties intended to create a security interest, citing Mitchell v. Shepherd Mall State Bank, 458 F.2d 700, 703 (10th Cir. 1972) and In re CFLC, Inc., 166 F.3d 1012 (9th Cir. 1999).  It further contends that it is not unusual for a Purchase Order to include a security agreement, citing Sommers v. International Business Machines, 640 F.2d 686, 688-89 (10th Cir. 1981) and O'Donnell v. American Employer's Insurance Company, 622 N.E.2d 570, 575 (Ind. Ct. App. 1993).

In response to the Receiver's argument that no document was "authenticated" by NPG, Bangor contends NPG authenticated the agreement in two ways.  First NPG accepted the terms of the Purchase Order and requested payment.  Second, in a letter dated November 17, 2009,

---

[2]The Purchase Order provides it is to be governed by the law of the State of Maine, but the UCC provisions are the same in both states.

NPG asked that Bangor "take ownership" of the timber mats, thereby authorizing it to invoice Bangor. Miller Decl. in Supp. of Bangor's Supplemental Mem. Ex. 5, at 2. In short, Bangor contends, NPG and it had an agreement creating a security interest. See Keisler v. Mission Compound, LLC, Bankr. No. 08-34321, 2010 WL 4627892, at *52-53 (Bankr. E.D. Tenn. Nov. 4, 2010) (lack of document entitled "security agreement" not fatal; agreement may be found "by implication from other circumstances").

Leaving aside the Receiver's contention that Bangor has never before asserted a UCC Article 9 security interest, Bangor fails to establish the basic components of such a security interest. First, as a general matter, a "'security interest' does not include the special property interest of a buyer of goods on identification of such goods to a contract for sale under ORS 72.4010[.]" ORS 71.2010(ii)(B). Consequently, something more is required than NPG's act of marking the mats with Bangor's name as that is simply the fulfillment of the Article 2 requirement that the product be "identified" to the contract.

It is true that a buyer may acquire a "security interest" by complying with ORS chapter 79. A provision in that chapter provides, a security interest is enforceable against the debtor when:

> (a) Value has been given;
>
> (b) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
>
> (c) One of the following conditions is met:
>
>> (A) The debtor has authenticated a security agreement that provides a description of the collateral . . . .

Page 8 - OPINION AND ORDER ON BANGOR HYDRO'S MOTION

[other options inapplicable].

ORS 79.0203(2).

The evidence simply does not support a conclusion that Bangor and NPG entered into an authenticated security agreement. The only documentation is a purchase order and an invoice, neither of which was authenticated by NPG. Further, the invoice identifies the product, the cost, and the delivery date and does not include language suggesting NPG gave Bangor an interest in the mats to secure performance. The letter from NPG, which is also unsigned, contains no language indicating Bangor had a security interest in the mats.

The cases on which Bangor relies are inapposite. Specifically, in Sommers, the court concluded that the purchase order "signed by Walter" was a security agreement. 640 F.2d at 688. O'Donnell is an Article 2 case, not an Article 9 case. In Mitchell, the document entitled "Security Agreement" was "executed." 458 F.2d at 702 (also describing "minimal requirement[]" that debtor sign a security agreement containing a description of the collateral). In re CFLC, Inc., the court emphasized, "The intent to create a security interest must appear on the face of a written document executed by the debtor." 166 F.3d at 1016. Finally, in Keisler the issue was whether a security agreement executed by the debtor as to only one lender was intended to provide subordinate lenders with a security interest in the corporation's stock.[3] Although the UCC updated the language to permit "authentication" in the digital age, rather than a written signature, there must be a document (or combination of documents) in which the debtor

---

[3]Since I found no security agreement, I need not reach Bangor's argument that it perfected its security interest by informing the Receiver as the alleged "bailee." ORS 79.0312(4); ORS 77.1020(a) and 77.1040.

has indicated its intent to transfer a security interest in the collateral to the secured party.  Bangor

has failed to demonstrate compliance with the requirements of the statute.

II.      Whether Bangor has an Article 2 Special Property Interest

In its claim submitted to the Receiver, Bangor asserted it had a "special property interest"

under UCC 2-501.  Indeed, the events more properly fit the Article 2 scenario than they do

Article 9.  The statute itself provides that Bangor's special property interest arose when the mats

were stamped with Bangor's name, thereby identifying them to the contract.  ORS 72.5010(b)

("If the contract is for the sale of future goods . . . , [identification occurs] when goods are . . .

marked or otherwise designated by the seller as goods to which the contract refers.").

As even Bangor acknowledges, the special property interest is intended to "protect the

buyer's interest in goods identified to the contract so that it can take steps to (a) insure them in

the case of loss, and (b) recover them in the case of insolvency and mitigate its damages.  In re

Alcom Am. Corp., 156 B.R. 873, 883 (Bkrcy. [sic] D.D.C. 1993))."  Bangor Supplemental Mem.

3.  Bangor underscores its right to "recover the goods from the seller" if "the seller becomes

insolvent within 10 days after receipt of the first installment on [the] price [of the goods]," ORS

72.5010, and "rights of unsecured creditors of the seller with respect to goods which have been

identified to a contract for sale are subject to the buyer's rights to recover the goods [under this

Article.]"  ORS 72.4020(1).  At bottom, Bangor argues it had the absolute right to recover the

3,000 timber mats identified to the contract in the same manner as a secured creditor.

The problem with Bangor's argument is that it declined to recover the goods identified to

the contract and for which it paid because the vast majority of the mats were nonconforming.

Indeed, the evidence reflects Bangor received all of the 8"x4'x16' timber mats in which it had a

"special property interest" under UCC 2-501.  NPG only had 561 such mats in its inventory on

February 9, 2010, the day after Bangor made its demand on the Receiver.  The remaining mats

were 18' and 20' long, and Bangor did not want those mats.

Bangor relinquished its special property interest in the nonconforming mats, thereby

waiving its right under Article 2.  A waiver is the "intentional relinquishment or abandonment of

a known right or privilege." Moore v. Mutual of Enumclaw Insurance Co., 317 Or. 235, 240,

855 P.2d 626 (1993).  Waiver may be implied by a party's conduct.  Wright Schuchart Harbor v.

Johnson, 133 Or. App. 680, 686, 893 P.2d 560 (1995).

> A waiver, under Oregon law, is the intentional relinquishment of a
> known right.  It must be plain and unequivocal, either in its terms
> or by conduct, clearly indicating an intention to renounce a known
> privilege or power.  In order to make out a case of waiver, there
> must be a clear, unequivocal, and decisive act of the party showing
> such a purpose.

Johnson v. Swaim, 209 Or. App. 341, 346, 147 P.3d 374 (2006) (internal citation omitted).

Here, Passadore informed Bangor about the receivership and informed it that a new

company had offered to buy NPG.  He then reported that the 3,000 mats were in places around

the country, but that he would have to cut them back from 18' and 20'.  Internal discussions

ensued and Bangor's counsel warned it that the new owner could cancel the agreement.  In that

case, Bangor would be left "with a claim against [NPG] who will not have assets to satisfy the

claim" and might require Bangor, "working with other unsecured creditors[,] to put [NPG] in

bankruptcy."  Landress Supplemental Decl. Ex. 7, at 2.  Bangor's counsel contacted the Receiver

and formally asserted a special property interest in the mats, but no one from Bangor ever

contacted the Receiver to replevy the mats as threatened.  Instead, Bangor stayed in contact with

Passadore, repeatedly telling him it did not want the 18' and 20' mats, and causing Passadore "heartburn" over assuring the mats were 16' only.  The remaining communications from Passadore informed Bangor that mats would be shipped mid-March, which was after the Asset Purchase Agreement had been signed and after the Court had approved the NPG sale to Bridgwell.

Although Passadore delivered mats NPG had in its possession before the March 1 sale, these were all the conforming mats that NPG had in its possession.  All other mats Passadore promised were to be produced and delivered "once the era of Bridgewell begins."  Martin Decl. Ex. G.[4]  Bangor made a choice to rely on Passadore's promises that the remaining conforming mats would be delivered after NPG's assets were sold, rather than demand delivery of the nonconforming mats.

Because Bangor took the risk that conforming mats would be delivered after the sale, it waived its right to assert any right in the sale proceeds.  I find In re G. Paoletti, Inc., 205 B.R. 251 (Bankr. N.D. Cal. 1997) helpful.  The court explained:

> [A] buyer's 'special property interest' in goods identified to the contract is a property interest in name only.  The only right this 'property interest' gives a buyer is the right to possession of the goods under certain circumstances.  If the buyer does not exercise this right and the goods are sold, the buyer has no right to any portion of the sale proceeds.

_____

[4]I agree with Bangor that Passadore believed the trigger for delivery of the remaining conforming mats would be a signed Asset Purchase Agreement and court approval of that agreement.  Contrary to the Receiver's observation, the evidence shows Passadore repeatedly referring to a time frame in mid-March for delivery, which was after the establishment of the new company.  Nevertheless, this factual dispute is irrelevant.  Passadore arranged for the delivery of all of the conforming mats NPG had in its possession (and in which Bangor had a special property interest) before the sale, which ended up being a total of 444, and arranged for the production and delivery of conforming mats after the sale to Bridgwell.

205 B.R. at 263-264.[5]

Bangor argues its right to require conformance does not waive its security interest in the nonconforming goods.  It cites General Electric Credit Corporation v. Gayl, 46 B.R. 370, 379 (Bankr. D. Del. 1985), but this case stands for the proposition that a seller may identify goods to a contract and later substitute *identical* goods that are then deemed identified to the contract. Bangor also argues its counsel asserted a special property interest in all of the mats (whether conforming or not) in its note to the Receiver on February 8, but its counsel also indicated that it "intends to exercise its rights under the UCC, including the right to reply the goods" and never did so.

Finally, Bangor argues it had the right to rely on Passadore's statements, and that it should not be penalized for doing so, since the Receiver was supervising Passadore.  The evidence shows, however, that Passadore was acting for the new owner not for the Receiver. Passadore refused to include the Receiver in discussions, described the Receiver as working for the bank, and he stressed repeatedly that deliveries would take place after the Asset Purchase Agreement was in place and the court had approved the agreement.  The Receiver testified that he had no idea what Passadore had arranged with Bangor, and there is no testimony from Bangor that it believed Passadore was acting on behalf of the Receiver.  Moreover, the mats that were delivered to Bangor before finalization of the Bridgewell sale were those conforming mats NPG had in its possession.

Bangor has a general unsecured claim.

_____

[5]California has adopted the same relevant UCC provisions as Oregon, making this case persuasive authority.

Page 13 - OPINION AND ORDER ON BANGOR HYDRO'S MOTION

## CONCLUSION

For the foregoing reasons, Bangor's Motion for Order to Establish Priority and Distribute

Proceeds of Bangor Hydro Blocked Account [555] is denied.


IT IS SO ORDERED.

DATED this _____21st_____ day of December, 2011.


    _/s/ Garr M. King_____
Garr M. King
United States District Judge

Page 14 - OPINION AND ORDER ON BANGOR HYDRO'S MOTION